James M. Kommers
Kommers Law Firm, P.C.
517 South 22nd Avenue, Ste. 5
Bozeman, MT 59718
Phone: (406) 587-7717
Email: kommerslawfirm@usa.net
Attorney for Plaintiff

CLERK OF THE
DISTRICT COURT
KRISTIE LEE JOELTER

2016 JUN 2 AM 7 50

FILED
BY VT
DEPUTY

## MONTANA THIRTEENTH JUDICIAL DISTRICT COURT,
## YELLOWSTONE COUNTY

| | |
|---|---|
| ESTATE OF STEVEN TYLER RUSSO, by its personal representative PATRICIA L. RUSSO-WOOD, <br><br> Plaintiff, <br><br> v. <br><br> YELLOWSTONE COUNTY, a political subdivision of the State of Montana; BRIAN DEGELE, individually; CITY OF BILLINGS, a municipality of the State of Montana; SANDRA LEONARD, individually; and JOHN AND JANE DOES 1 through 5, individually, <br><br> Defendants. | Cause No. DV 16-0756 <br><br> RUSSELL C. FAGG <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> 120/123726 |

Plaintiff for its complaint alleges:

1. This Court has jurisdiction and venue over the civil rights claim of Estate of Steven Tyler Russo and all claims and causes of action alleged herein. Venue is proper because all acts complained of herein occurred in Yellowstone County.

2. Plaintiff Patricia L. Russo-Wood is a resident of the State of Illinois and the mother of decedent Steven Tyler Russo. Steven Tyler Russo died on or about June 6, 2013, while

incarcerated as a pretrial detainee in the Yellowstone County Detention Facility (YCDF), a jail facility operated by the County of Yellowstone, a political subdivision of the State of Montana.

The Estate of Steven Tyler Russo is a probate action filed in the State of Illinois in the Circuit Court of the Seventeenth Judicial District, County of Winnebago, Case No. 2015 P44. Decedent was a citizen of the United States of America and resident of the State of Montana at the time of his death. Patricia L. Russo-Wood has been appointed Personal Representative.

3. Brian Degele is a classification officer employed by the County of Yellowstone at the detention facility who was acting at all times within the course and scope of his employment.

4. Defendant City of Billings is a local government municipality within the State of Montana. The City of Billings contracts with the YCDF as a local facility for the incarceration of arrestees and pretrial detainees related to criminal charges. Defendant Sandra Leonard was a police detective employed by the City of Billings acting within the course and scope of her employment.

5. John and Jane Does 1through 5 are employees of the County of Yellowstone working as detention officers in the YCDF. Additional claims may be brought against the Doe defendants on the basis of facts, which may become apparent through discovery.

6. April 25, 2013, Mr. Russo was jailed at Yellowstone County Detention Facility after arrest by Billings police. His record showed he was a no-show for all court dates since his arrest by Billings police in March 2011. He was released on his own recognizance.

7.  On May 3, 2013, Steven's mother Patricia Russo spoke with Billings city attorney Stacey Tenney about her concern that he was being released from jail without thereafter showing up for court. Ms. Russo expressed her concern for Steven's welfare and stated he could harm himself.

8.  On or about May 11-13, 2013, Mr. Russo was arrested and placed in YCDF and thereafter released on his own recognizance and ordered to appear in drug court on May 22, 2013, at 10:30 a.m. He did not appear in court.

9.  On June 5, 2013, Mr. Russo was arrested by Billings police after a high speed chase in a stolen vehicle and subjected to a Tazer and shouted to his friends in the presence of officers, "I'll see you on the other side."

10. On June 5, 2013, during the morning, Mr. Russo was observed by detention officers to be in an emotional state. According to a witness, he was yelling loudly and repeatedly from his cell, "Tell my family how much I love them and good-by for me." Detention officers told him to stop shouting.

11. On June 5, 2013, Mr. Russo showered and was observed by an officer to be so emotional that an entry was made in his Progress Sheet, "Inmate very emotional, bears watching." Russo was moved to a classified cell, housed by himself, and checked every 15 minutes by officers in that unit who were told to "Keep an eye on him."

12. Brian Degele, Classification Officer, at YCDF interviewed Mr. Russo for the purpose of formally classifying him using a point system. Mr. Degele assigned him a "13" point classification number requiring him to be housed in maximum security, which is the "classification unit." Contrary to his assessment and jail policy, Mr. Degele designated

Mr. Russo for medium security allegedly because of jail overcrowding, according to his inquest testimony.

13. This 13-point classification never changed. The facility was overcrowded on June 5-6, 2013. However, it is clear there was room for Mr. Russo in maximum security because he had a cell there all to himself when detention officer Dunker took him out of maximum security and placed him in medium security on June 6, 2013.

14. June 5, 2013, at 9:42 p.m., Detective Sandy Leonard interviewed Mr. Russo for more than an hour. Mr. Russo was denied the phone right to call his mother or an attorney. Sandy Leonard called Ms. Patricia Russo and during a 34 minute conversation told Patricia, "I have been a Billings police detective for many years. I have met many bad people and many evil people and I can tell you that your son is neither. Your son is a very troubled person." Detective Leonard informed Ms. Russo that Steven was to be arraigned in court the next day, Thursday, June 6, 2013, at 3:30 p.m. and that he had repeatedly been asking for a lawyer. Detective Leonard related Steven told her during the interview he had been using methamphetamine for seven days straight with no sleep.

15. June 6, 2013, at about 9:20 a.m., Mr. Russo was moved out of the maximum security classification unit without a change of classification on the decision of Brian Degele and corrections officer Dunker who took Mr. Russo to medium security.

16. On June 6, 2013, at 9:28 a.m., Patricia Russo received a call from Steven and began the process of establishing a credit card number when the call ended. Lock-down occurs at 9:30 a.m.

17. On June 6, 2013, at 1:00 p.m., lock-down ended and cell #42 opened. Detention Officer

Shirly stated at the inquest he could not keep track of 44 people, individually, all the time. This officer knew at the time of the entry on the Progress Sheet that Mr. Russo "bears watching."

18. On June 6, 2013, around 2:00 p.m., Officer Shirly allowed Mr. Russo to shower by himself, unsupervised, in the lower tier shower. Mr. Russo requested the shower and was allowed to do so despite this standing classification of 13 and the Progress Sheet entry "bears watching."

19. On June 6, 2013, 2:15 or 2:20 p.m., lock-down occurred and thereafter Officer Shirly discovered Mr. Russo had not returned from the shower and was not in his cell #42. Thereafter, Officer Shirly saw Mr. Russo hanging in shower. A call for assistance was made between 2:17 and 2:21 p.m.

20. On June 6, 2013, at 8:32 p.m., Ms. Russo called YCDF about the court appearance scheduled for 1:30 p.m. and was told Steven Russo had not appeared in court but no other explanation was given.

21. On June 7, 2013, at 1:09 p.m., Ms. Russo called YCDF to inquire and was told Mr. Russo had not been arraigned, and no bond was set.

22. On June 7, 2013, at 8:04 p.m., Ms. Russo received a call from a friend who expressed condolences for her son's death reported in the *Billings Gazette* (06/07/2013) that Mr. Russo had hung himself the previous day. Ms. Russo placed several calls to the YCDF but was put on hold for 27 minutes until someone finally took her name and phone number.

23. On June 7, 2013, at 9:03 p.m., Coroner Fehr called Ms. Russo and stated Steven Tyler

Russo had died Thursday, June 6, 2013, due to hanging. Mr. Fehr was told by jail personnel that Steven had no family so Mr. Fehr made no attempt to contact any.

24. On June 11, 2013, Detective Leonard called Ms. Russo and told her, "In no way is her department responsible for any wrong doing that may have led to his suicide."

25. On October 29, 2013, at the inquest, Lieutenant Sam Bofto, Facility Commander at YCDF, testified that YCDF houses inmates for other Montana counties.

26. These inmates add to gross overcrowding at YCDF.

27. On October 29, 2013, Lieutenant Sam Bofto testified all corrections officers are sent for training at Montana Law Enforcement Academy that includes education in "watching people, learning how look for behaviors and that sort of thing."

28. On October 29, 2013, Lieutenant Sam Bofto identified a mental health professional who is on call 24/7 to come and immediately assess the situation with Steven Tyler Russo present on June 5-6, 2013.

29. No mental health re-assessment was made by this person or anyone else to change the original classification of Steven Russo when he was moved out of the classification unit to which he was first admitted for his safety.

## FIRST CLAIM - NEGLIGENCE

30. Plaintiff realleges and incorporates paragraphs 1 - 53.

31. All Defendants had a duty to exercise reasonable and ordinary care for the life and health of Steven Tyler Russo and to keep him safe and protected from unnecessary harm. All Defendants had a duty to render medical aid when necessary and to treat Mr. Russo humanely. All Defendants had a duty to exercise reasonable care and because of his

classification as a "13" inmate and warnings written in his jail file to keep an eye on him. All Defendants had a duty to comply with the YCDF manual.

32. Sandra Leonard had a duty to have Mr. Russo examined by a mental health professional because she knew he had admitted to her he had been taking methamphetamine for seven days without sleep.

33. Brain Degele had a duty to classify Mr. Russo for maximum security and keep him there because he rated a "13" classification. Classification to medium security is against policy without a change in classification or examination by the mental health professional on call 24/7 days per week.

34. Yellowstone County had further duties imposed by its manual establishing the policies and procedures in the operation of the YCDF. One goal of that manual is to ensure all inmates receive health care comparable to that available to the citizens of the surrounding community. No medical screening was done to determine if on June 6, 2013, Mr. Russo was free of the effects of seven days consumption of methamphetamine. He was apparently simply taken out of classification "13" by fiat of the classification officer. Mr. Degele's concern for overcrowding was unfounded because maximum security had room for Mr. Russo as a classified "13" because he was in a maximum security cell by himself when Mr. Dunker removed him. A mental health professional was available upon request for immediate assessment and was not consulted. No expert testimony is required to establish breach of the jail's own standards when the conduct is readily apparent to a lay person. These circumstances depict a clear failure to meet obvious duties.

35. The City of Billings had a duty to place Mr. Russo in a safe jail environment. The City of

Billings attorney had been warned by Patricia Russo-Wood of Mr. Russo's mental problems and was aware of Detective Leonard's concern and objective knowledge of his state of mind. The City of Billings, nevertheless, placed Mr. Russo in a jail it knew to be overcrowded. The City of Billings had a duty to provide Mr. Russo with required health care and failed to do so.

36. Each Defendant breached their duties to Plaintiff, and as a result thereof, their actions and omissions caused injury and death to Mr. Steven Tyler Russo.

37. The limitation on governmental liabilities for damages stated in M.C.A. § 2-9-108 violates Plaintiff's federal and state constitutional right to equal protection and due process. That statute is unconstitutional.

## SECOND CLAIM - CIVIL RIGHTS VIOLATIONS BY SANDRA LEONARD

38. Plaintiff realleges and incorporates herein paragraphs 1-53. Sandra Leonard acted under color of law at all times.

39. Detective Leonard's knowledge that Mr. Russo had been on a methamphetamine binge for a week without sleep created a duty to address his condition by referral to a medical professional. His extensive recent drug abuse described to Detective Leonard created a duty to have a professional assess Mr. Russo's mental health.

40. Detective Leonard acted in such a manner as to deprive Mr. Russo of one or more of his federal constitutional rights, which conduct is actionable by 42 U.S.C. § 1983. State tort claims are actionable pursuant to M.C.A. § 27-1-701 and M.C.A § 27-1-712

41 Detective Leonard exhibited deliberate indifference to a serious mental health need by failing to seek treatment for Mr. Russo's medical conditions. Detective Leonard violated

Mr. Russo's federal constitutional rights. Her conduct was a moving force in the cause of Mr. Russo's death and injury to the Plaintiff.

42. A greater duty is owed when a person is so affected by drug abuse as to be incapacitated for physical or mental effort. The standard of care owed by a law enforcement officer to a prisoner placed in his care and custody-to keep the prisoner safely and free from harm, to render him medical aid when necessary, and to treat him humanely and refrain from oppressing him. When a person is so intoxicated as to be incapacitated for physical or mental effort, a greater duty is owed to him by the person whose duty it is to exercise care for his safety. A person who is known to be under the influence of drug abuse, like those who are otherwise under a disability, is entitled, by reason of his incapacity to care for himself, to redoubled vigilance on the part of those who may owe him a duty to avoid an injury.

43. Defendant Sandra Leonard's deliberate indifference to an observed condition was the cause of death under 42 USC § 1983 law. Federal courts only require evidence the failure to act be so closely related to the depravation of decedent's rights as to be the moving force that cause the ultimate injury. Detective Leonard's failure to obtain a professional medical assessment by nurses who were on duty and a psychological assessment by the professional on call was an act of deliberate indifference.

### THIRD CLAIM - CIVIL RIGHTS VIOLATIONS BY BRIAN DEGELE

44. The allegations of paragraphs 1- 53 are included herein by reference. Defendant Classification Officer Brian Degele acted under color of law at all times.

45. Classification Officer Brian Degele acted in such a manner as to deprive Mr. Russo of

one or more of his federal constitutional rights, which conduct is actionable by 42 U.S.C. § 1983. State tort claims are actionable pursuant to M.C.A. § 27- 1-701 and M.C.A § 27-1-712.

46. Defendant Classification Officer Brian Degele exhibited deliberate indifference to a serious mental health need by failing to seek treatment for Mr. Russo's medical conditions. Brian Degele violated his federal constitutional rights. His conduct was a moving force in the cause of Mr. Russo's death and injury to the Plaintiff.

47. Mr. Degele testified at the inquest into the cause of death of Mr. Russo that classified inmates are moved to medium security on a daily basis due to overcrowding. The fact Mr. Russo was in maximum security cell when he was taken out and moved to a medium security cell proves the jail had adequate space for Mr. Russo. Mr. Russo was moved without a change in classification from "13" and his jail filed contained the notation he "bears watching." Mr. Degele's conduct and that of other county officials shows a deliberate indifference to the rights of Mr. Russo by moving him out of a safe jail cell, which was a moving force in the cause of his death.

48. At least three detention officers, including Mr. Degele, knew Mr. Russo was at risk of mental health problems. Mr. Degele interviewed him and classified him as a pretrial detainee in need of classified maximum security with supervision every 15 minutes. Mr. Degele did not call the 24/7 mental health professional for evaluation or assistance.

Officer Shirly's knowledge that Mr. Russo "bears watching" is sufficient to deny Mr. Russo's request to leave the floor and go to the unsupervised shower. At no time after the original classification of Mr. Russo did the jail staff determine if the existing

effect of methamphetamine abuse on Mr. Russo's mental capacity had abated.

49. Detention Officer Aglin told other officers to keep an eye on Mr. Russo and entered a warning in his file that he needed watching. Officer Shirly knew about the warning in Mr. Russo's file and yet allowed him to leave the floor to shower alone. Had detention personnel followed their own assessment and written policy and maintained 15 minute observations until Mr. Russo's release, his death would not have occurred in the YCDF.

50. Detective Leonard's conduct and that of Brian Degele were substantial factors in bringing about Mr. Russo's death. Mr. Russo faced a serious medical need;
Defendants were deliberately indifferent to that medical need, that is, they knew of it and disregarded it by failing to take reasonable measures to address it; and the failure to act by Defendants caused harm to Mr. Russo.

At all relevant times, the police Detective Sandra Leonard and Classification Officer Brian Degele were acting in the course and scope of their employment. As a pretrial detainee, Mr. Russo had a right to reasonable and necessary medical care under the Fourteenth Amendment, United States Constitution. Mr. Russo clearly demonstrated a serious medical need when he overtly displayed symptoms observed by Detective Leonard ("Your son is a very troubled person." and "He told me he had been using methamphetamine for over seven days straight with no sleep.") and classification officer Brian Degele (Russo rates a "13," "classification unit,") and Officer Anglin ("Keep an eye on him.").

51. Defendant Brian Degele's deliberate indifference to an observed condition was the cause of death under 42 USC § 1983 law. The law only requires evidence the failure to act be

so closely related to the depravation of decedent's rights as to be the moving force that cause the ultimate injury. Releasing Mr. Russo into a general population so he could shower out of sight is such an act.

52. Defendants Leonard and Degele are liable for punitive damages because their conduct involved a callous or reckless indifference to the constitutional rights of others. Overcrowding is not a legally sufficient reason to deprive a pretrial detainee of the right to mental health care. This conduct occurs on a daily basis at YCDF. The function of punitive damages is to set an example and by this claim for damages, the Court can bring Yellowstone County officials to bear responsibility for their callous indifference to inmates such as Mr. Russo.

53. To the extent Plaintiff incurs attorney's fees in maintaining this action, the Estate is entitled to reasonable attorney's fees as damages by 42 U.S.C. § 1988.

**REQUEST FOR RELIEF**

1. Plaintiff requests judgment against Defendants Yellowstone County, Brian Degele, City of Billings, and Sandra Leonard for their negligence, which caused the mental and physical pain and suffering and death to Steven Tyler Russo, in a monetary amount to be determined at trial, and costs incurred, and such other relief as the Court may deem just.

2. Plaintiff requests judgment against Defendants Sandra Leonard and Brian Degele for monetary damages arising from deprivation of Mr. Russo's civil rights leading to mental pain and suffering and death; for punitive damages allowed by law; for attorney's fees incurred by the Estate; costs incurred; and such other relief as the Court deems just.

3. Plaintiff requests a declaration by this Court that the statutory cap on damages be declared

unconstitutional.

DATED this 31 day of May 2016.

					James M. Kommers
					Kommers Law Firm, P.C.
					Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues of fact.

DATED this 31 day of May 2016.

					James M. Kommers
					Kommers Law Firm, P.C.
					Attorney for Plaintiff