IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| PATRICIA L. RUSSO-WOOD, as personal representative of the Estate of Steven Tyler Russo,<br><br>        Plaintiff,<br><br>vs.<br><br>YELLOWSTONE COUNTY, *et al.*,<br><br>        Defendants. | CV 17-38-BLG-TJC<br><br>**ORDER** |

Plaintiff Patricia L. Russo-Wood, as the personal representative of the Estate of Steven Tyler Russo ("Plaintiff"), brought this action against Yellowstone County, the City of Billings, and individual officers Brian Degele and Sandra Leonard.[1] Plaintiff asserts claims for negligence and civil rights violations under 42 U.S.C. § 1983 after her son, Steven Tyler Russo, committed suicide while being held as a pretrial detainee at the Yellowstone County Detention Facility. (Doc. 3.) Presently before the Court are Defendant Brian Degele's Motion for Summary Judgment (Doc. 61), Defendant Yellowstone County's Motion for Summary Judgment (Doc. 77), and Plaintiff's Motion to Amend Complaint. (Doc. 79.)

---

[1] The claims against the City of Billings have been dismissed (Doc. 56), and summary judgment was granted in favor of Sandra Leonard. (Doc. 53).

1

Having considered the parties' submissions, the Court finds Plaintiff's Motion to Amend should be **DENIED**; Brian Degele's Motion for Summary Judgment should be **GRANTED;** and Yellowstone County's Motion for Summary Judgment should be **DENIED**.

## I.     FACTUAL BACKGROUND[2]

The Yellowstone County Detention Facility ("YDCF" or the "Facility") is operated by the Yellowstone County Sheriff.  (Doc. 62 at ¶ 1.)  YCDF has policies, procedures and practices for the operation of the Facility, the classification of detainees, and the treatment of suicidal detainees.  (*Id.* at ¶ 2.)

The Facility has four general categories of housing units: classification, general population, administrative segregation, and disciplinary segregation.  (*Id.* at ¶ 3.)  There are three subcategories of general population units: maximum security, medium security, and minimum security.  (*Id.*)   The "Classification A" unit in the Facility is a maximum security unit.  It is also used for administrative segregation, where a detainee is housed for protection from other detainees, and as a disciplinary segregation unit, when a detainee has violated a Facility rule.  (*Id.*)  The "North 1" and "North 3" units in the Facility are medium security units, while

---

[2]  The background facts set forth here are relevant to the Court's determination of the pending motions for summary judgment and are taken from the parties' submissions and are undisputed except where indicated.

the "North 4" and "North 5" units are minimum security. (*Id.*)

Detainees are screened for placement into the appropriate unit through a process called "classification." (*Id.*) Detainees are typically placed in the "North 2" unit while waiting to be classified. (*Id.* at ¶ 12.) When there are too many detainees waiting to be classified in North 2, the excess detainees are placed in Classification A pending classification. (*Id.*)

In dealing with potentially suicidal detainees, there is an apparent conflict between the written policies and procedures for the Facility, and the actual practices. The Policies and Procedures Manual provides that staff should place a suicidal detainee in administrative segregation (Classification A) pending an evaluation by the Facility's physician. (*Id.*)

The Facility's actual practice, however, is to transport the detainee to the front, "Booking" area of the Facility. There, staff will provide the detainee with suicide resistant clothing, place the detainee in a holding cell, and contact the Facility's mental health provider for an evaluation. (*Id.* at ¶ 4.[3]) The staff in Booking frequently observes the detainee. (*Id.*) After an evaluation, the mental health provider may clear the detainee for placement back in his unit, have the

---

[3] Plaintiff indicates she disputes all statements in Statement Undisputed Facts ("SUF") No. 4 as "not applicable" to Russo because he did not threaten suicide. (Doc. 91 at ¶ 4.) Plaintiff, does not however, dispute the accuracy of the statements.

detainee held in the Booking holding cell for continued observation, or have the detainee transferred to the Billings Clinic for treatment. (*Id.*) According to the County, this practice lessens the chance that a detainee will harm himself through the use of suicide resistant clothing and more frequent observations. (*Id.*)

On June 5, 2013, at approximately 9:33 a.m., Billings police officers arrested the decedent, Steven Tyler Russo ("Russo"), on various charges and transported him to YCDF. (*Id.* at ¶ 7.) YCDF detention officers Jake Dunker and Jarred Anglin processed Russo into the Facility. (*Id.* at ¶ 8.) At the request of the Billings Police Department, Russo was not given telephone privileges. (*Id.*[4]) Russo was placed into a holding cell in Booking. (*Id.* at 9.)

Anglin subsequently took Russo to the shower because he had soiled himself when he was tasered by law enforcement officers during his arrest. (*Id.*) While Russo was in the shower, Anglin heard him cry and then laugh. (*Id.* at ¶ 10.) Anglin noted on Russo's Prisoner Progress Sheet that "[Inmate] very emotional, bears watching." (*Id.*; Doc. 76-22.)

After the shower, Russo remained in Booking until approximately 1:30 p.m.

---

[4] Plaintiff indicates she disputes this statement in SUF No. 8. (Doc. 91 at ¶ 8.) However, Plaintiff does not cite to any "specific pleading, deposition, answer to interrogatory, admission or affidavit before the court to oppose" the statement, as required by Local Rule 56.1(b)(1)(B). Rather, the facts Plaintiff cites relate to the notation in Russo's Progress Sheet that "I/m very emotional – bears watching", which is not contrary to the facts proffered in SUF No. 8. (*Id.*)

(*Id.* at ¶ 11.)  Russo was then transported to Classification A.  (*Id.* at ¶ 12.)  At that point, Russo had not been classified.  (*Id.*)  Defendants contend Russo was placed in Classification A while he was awaiting classification because it would be easier to prevent his use of a telephone.  (*Id.*)  Defendants maintain Russo was not placed in Classification A because of a Facility security concern or a mental health issue. (*Id.*)

Plaintiff contends Russo was placed in Classification A because the Facility was overcrowded at the time, and classification officers addressed overcrowding by reassigning or juggling inmates among different jail sections, contrary to written policy.  (Doc. 91 at ¶ 12.)  Plaintiff points out that YCDF was designed to house 286 inmates.  (Docs. 90-1 at 16; 90-3 at 7-8.)  But at the time Russo was detained, there were approximately 400 inmates.  (*Id.*)

Russo was housed in Classification A from approximately 1:30 p.m. on June 5, 2013 until 9:20 a.m. on June 6, 2013.  (Doc. 62 at ¶ 13.)  He did not have a cellmate during that time.  (*Id.*)

At approximately 6:10 p.m. on June 5, 2013, Detective Sandra Leonard ("Leonard") arrived at YCDF to interview Russo.  (*Id.* at ¶ 14.)  Leonard interviewed Russo in Booking.  (*Id.*)  Defendants contend that Russo was well-behaved during the interview, and Leonard did not observe any behavior that indicated Russo presented a suicide risk.  (*Id.*)  Plaintiff counters that Leonard told

5

her in a phone call later that evening that "I have been a Billings police detective for many years.  I have met many bad people and evil people and I can tell you that your son is neither.  Your son is a very troubled person."  (Doc. 91 at ¶ 14.)

Immediately after Leonard's interview, Defendant Brian Degele, a YCDF Officer ("Degele"), performed a classification interview of Russo in Booking from approximately 6:45 p.m. to 7:30 p.m.  (Doc. 62 at ¶ 15.)  Russo's objective classification score, based on the Initial Custody Assessment Scale, was 13.  (*Id.*)  The score indicated Russo should be placed in maximum security.  (*Id.*)  But Degele determined Russo could be placed in medium security based on his prior behavior in the Facility, and his demeanor during the interview.  (*Id.*)  According to the Classification Interview Sheet, Russo indicated he had no mental health problems, was not suicidal, and he had not attempted suicide in the past.  (*Id.*; Doc. 76-21.)  Degele's only contact with Russo was during the classification interview.  (*Id.*)

Following, the classification interview, Russo was returned to Classification A for a medical check prior to being placed in either North 1 or North 3 when space was available.  (Doc. 62 at ¶ 15.)

On June 6, 2013, Russo was interviewed by Billings Police Department Detectives Keith Buxbaum and Brett Kruger from approximately 7:30 a.m. to 8:45 a.m.  (Doc. 62 at ¶ 16.)  Defendants assert the interview took place in Booking.

6

(*Id.*)  Plaintiff disputes this, stating Russo's Progress Sheet showed he was in Classification A until he was moved to the medium security unit.  (Doc. 91 at ¶ 16.)

At approximately 9:20 a.m. on June 6, Robert Dunker, a YCDF Officer, transferred Russo from Classification A to North 3.  (Doc. 62 at ¶ 17.)  Officer Dunker believed that a medical check had been performed on Russo, but a medical check had never been completed prior to Russo's transfer from Classification A.  (*Id.*; Doc. 91 at ¶17.)

From approximately 9:20 a.m. until 2:00, Russo was in North 3, Cell 42.  (Doc. 62 at ¶ 18.)  Russo's cellmate was Corey Johnson.  (*Id.*)  YCDF Officer James Shirley was assigned to North 3 during that time.  (*Id.*)

At approximately 2:00 p.m., Russo requested to use the shower, and was allowed to do so.  (*Id.* at ¶ 19.[5])  At 2:15, Shirley began to lockdown the unit and noticed Russo was not in his cell.  (*Id.*)  Shirley asked Johnson where he was, and Johnson indicated Russo was still in the shower.  (*Id.*)  Shirley went to check on Russo and found he had hanged himself with his underwear in the shower.  (*Id.*)  Shirley summoned assistance and rendered first aid.  (*Id.*)  The Billings Fire

---

[5] Plaintiff indicates she disputes most of the statements in SUF No. 19.  (Doc. 91 at ¶ 19.)  Again, however, Plaintiff does not cite to any facts to oppose the statements, as required by Local Rule 56.1(b)(1)(B).

Department and American Medical Response arrived and transported Russo by ambulance to the Billings Clinic.  (*Id.*)  Russo was pronounced dead in the Emergency Department shortly after his arrival.  (*Id.* at ¶ 20.)

On June 10, 2013, Dr. Thomas Bennet, a pathologist, performed an autopsy on Russo and determined Russo had died from asphyxiation by hanging himself.  (*Id.* at ¶ 21.)

Prior to his incarceration in June 2013, Russo had been detained at YCDF seven times.  (*Id.* at ¶ 5.)  He had never threatened suicide, attempted suicide, or claimed to be suicidal during any of his prior stays in the Facility.  (*Id.*)

Defendants contend that other than being emotional in the shower after he arrived at the Facility on June 5, 2013, Russo did not display any other external indications of emotional lability.  (*Id.* at ¶ 10.)  They assert he interacted appropriately, did not yell or scream, did not threaten to harm himself, and did not appear suicidal.  (*Id.* at ¶¶ 11, 13, 14, 15, 16, 18.)  Defendants further assert law enforcement officers and the YCDF Officers, including Degele, did not observe anything that indicated Russo was suicidal, or that the YDCF staff needed to initiate the suicide prevention protocol.  (*Id.* at ¶¶ 8, 10-11, 13-16, 18.)

Plaintiff counters that the notation in his Progress Sheet that he was "very emotional, bears watching" travelled with him throughout the facility and was never changed or modified.  Plaintiff contends that it should have been read by

every officer who came in contact with Russo, and should have provided notice that he was at risk to harm himself. (Doc. 91 at ¶ 6, 8, 12-14, 18.)

## II.    PLAINTIFF'S MOTION TO AMEND COMPLAINT

The Court will first address Plaintiff's Motion to Amend the Complaint. (Doc. 79.)  Plaintiff seeks to remove the City of Billings from the caption as a named Defendant, and seeks to more specifically allege her claim against Degele under 42 U.S.C. § 1983.  Plaintiff does not seek to add any additional claims or parties.  The County and Degele oppose the motion to the extent the amendment seeks to add new facts, arguing Plaintiff was not diligent in moving to amend, the proposed amendment is unnecessary, and it would be prejudicial to Defendants.

On May 15, 2017, the Court issued a Scheduling Order setting the deadline to amend pleadings for June 30, 2017.  (Doc. 23.)  Plaintiffs filed the instant motion seeking leave to amend on April 16, 2018.  (Doc. 79.)

### A.    Legal Standards

In situations where the deadline for amendments to pleadings has passed, a party must meet the more stringent requirement of Rule 16(b), which requires a showing of good cause why the party did not seek leave to amend within the Court's scheduling order.  Fed.R.Civ.P. 16(b)(4) ("[a] schedule may only be modified for good cause and with the judge's consent"); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000).

In *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992), the Ninth Circuit explained that "[u]nlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." Good cause to excuse noncompliance with the scheduling order exists if the pretrial schedule "cannot reasonably be met despite the diligence of the party seeking the extension." *Id.* (quoting Fed. R. Civ. P. 16 Advisory Committee's Notes (1983 Amendment)).

Prejudice to the opposing party may provide an additional reason to deny a motion to amend, but "the focus of the inquiry is upon the moving party's reasons for seeking modification." *Id.* at 609. "If that party was not diligent, the inquiry should end." *Id.*; *see also In re Western States Wholesale Natural Gas Antitrust Litigation*, 715 F.3d 716, 737 (9th Cir. 2013) (upholding denial of motion to amend where "the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action").

If good cause exists for seeking amendment after the scheduling order's deadline, the Court then turns to Rule 15(a) to determine whether amendment should be allowed. "Although Federal Rule of Civil Procedure 15(a) provides that leave to amend 'shall be freely given when justice so requires,' it 'is not to be

granted automatically.'" *In re Western States*, 15 F.3d at 738 (quoting *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir.1990)).  Under Rule 15(a), the Ninth Circuit directs that courts consider the following five factors to assess whether to grant leave to amend: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether plaintiff has previously amended his complaint." *Id.*  These factors do not merit equal weight, however.  "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

### B.    Good Cause Under Rule 16

As noted above, Plaintiff seeks to amend the Complaint to include additional facts regarding her §1983 claim against Degele.  The Court finds that Plaintiff did not act diligently in seeking to amend the Complaint.  The motion to amend was filed over nine months after the Court's deadline to amend pleadings.  Further, Plaintiff has not shown good cause for her noncompliance with the Scheduling Order.  Plaintiff indicates discovery produced additional facts that allow her to more specifically allege the § 1983 claim against Degele.  But Plaintiff has not specified what discovery she is referring to, or when she received it.  Defendants note that Degele was deposed on December 4, 2017, which was over four months before the motion to amend was filed.  Because Plaintiff fails to offer any explanation why the motion to amend could not have been filed sooner, the Court

finds the good cause requirement of Rule 16 is not satisfied. *See e.g. Schwerdt v. Int'l Fidelity Ins. Co.,* 28 F. Appx. 715, 719 (9th Cir. 2002) (delay of one month after learning of facts from a witness's deposition did not constitute diligence under Rule 16 in seeking leave to amend); *Sako v. Wells Fargo Bank, Nat. Assoc.*, 2015 WL 5022326, *2 (S.D. Cal. 2015) ("[W]aiting two months after discovering new facts to bring a motion to amend does not constitute diligence under Rule 16"); *Experexchange, Inc. v. Doculex, Inc*., 2009 WL 3837275, at 29 (N.D. Cal. Nov. 16, 2009) (delay of two months after discovering new facts, and after fully briefed summary judgment motion, did not meet the good cause standard under Rule 16).

Plaintiff suggests the Court should not strictly apply the Rule 16(b) standard because she does not seek to join a party or add a new theory of liability. Regardless of the scope of the proposed amendment, however, parties are expected to comply with scheduling orders. As the Ninth Circuit cautioned, "[a] scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Johnson*, 975 F.2d at 610-1. The Ninth Circuit explained that disregarding scheduling orders undermines "the court's ability to control its docket, disrupt[s] the agreed-upon course of the litigation, and reward[s] the indolent and the cavalier. Rule 16 was drafted to prevent this situation and its standards may not be short-circuited by an appeal to those of Rule

15." *Id.* The Court finds no reason to deviate from Rule 16(b) here. Because the Court finds that Plaintiff has not acted diligently, Plaintiff's request to amend will be denied.

### C.     Amendment Under Rule 15

Even if the Court were to find "good cause" under Rule 16, application of the Rule 15 factors also dictates denial of the motion to amend. Although there is no indication Plaintiff acted in bad faith, and Plaintiff has not previously moved to amend, the Court finds the proposed amendment is unnecessary and would be unduly prejudicial to Defendants.

Defendants have not challenged the sufficiency of the allegations in the Complaint. Therefore, it is unnecessary for Plaintiff to amend the Complaint to pursue her § 1983 claim against Degele. As Defendants point out, any new facts Plaintiff has learned during discovery may be presented at trial. Those facts may also be asserted in responding to Defendants' motions for summary judgment. Moreover, the Court finds Defendants would be unduly prejudiced by amendment at this late stage. The time for discovery has ended. The deadline for pretrial motions has past, and motions for summary judgment have been filed.

Therefore, because Plaintiff has not shown good cause for her delay in seeking amendment, and because the amendment is unnecessary and prejudicial to Defendants, Plaintiff's Motion to Amend the Complaint is DENIED.

## III.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Legal Standards

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.  *Id*.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways:  (1) by presenting evidence that negates an essential element of the non-moving party's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *Id.* at 322-23.  If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider

the non-moving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact. *Kennan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)).

### B.      Negligence Claims Against Degele and Yellowstone County

Plaintiff brings a negligence claim against both Degele and Yellowstone County. (Doc. 1.) Degele contends he is entitled to judgment as a matter of law because he has statutory immunity from Plaintiff's negligence claim. Degele and the County also argue summary judgment is appropriate because they were not negligent as a matter law. They deny the existence of a duty, breach of a legal duty, or that their actions were a legal cause of Russo's suicide.

### 1.      Negligence Claim Against Degele

Degele moves for summary judgment on Plaintiff's negligence claim on grounds that he is immune from individual liability under Montana Code Ann. § 2-9-305(5). Section 2-9-305 provides in relevant part:

> In an action against a governmental entity, the employee whose conduct gave rise to the suit is immune from liability by reasons of the

same subject matter if the government entity acknowledges or is bound by a judicial determination that the conduct upon which the claim is brought arises out of the course and scope of the employee's employment, unless the claim constitutes an exclusion provided in subsections (6)(b) through (6)(d).

Mont. Code Ann. § 2-9-305(5).

The Montana Supreme Court has confirmed that § 2-9-305(5) provides immunity from claims against individual employees for actions performed within the scope of their employment when a suit against the government entity arises out of the same subject matter. *See Kenyon v. Stillwater County*, 835 P.2d 742, 745 (Mont. 1992), overruled on other grounds by *Heiat v. E. Mont. College*, 912 P.2d 787, 793 (Mont 1996) ("[W]here an action is brought against a county based on actionable conduct by an employee, the employee is immune from individual liability for the conduct if the county acknowledges that the conduct arose out of the course and scope of the employee's official duties."); *Griffith v. Butte School Dist. No. 1*, 244 P.3d 321, 335 (Mont. 2010) ("Section 2-9-305(5), MCA, serves as a complete bar to holding [individual employees] liable because it provides immunity from suit to individually-named defendants for actions performed within the course and scope of the official's employment."); *Germann v. Stephens*, 137 P.3d 545, 553 (Mont. 2006) ("The explicit grant of immunity in the second sentence of § 2-9-305(5), MCA, belies [the plaintiff's] contention that the statute serves merely as an anti-double recovery statute.").

In order for immunity to attach under § 2-9-205(5), the plaintiff must (1) name a governmental entity as a defendant, and (2) the governmental entity must acknowledge or be bound by a judicial determination that the employee's conduct upon which the claim was brought arose out of the course and scope of his employment. Mont. Code Ann. § 2-9-205(5). Here, the County, a government entity, is a named defendant. All of Plaintiff's allegations against Degele are based on actions he performed while he was working at YCDF. The County has also acknowledged that Degele acted in the course and scope of his employment with the County when he classified Russo. (Doc. 66 at ¶ 2.) No evidence suggests Degele was acting outside his role as a YCDF Officer at any time relevant to Plaintiff's claims. Consequently, Degele is immune under § 2-9-205(5) from individual liability for Plaintiff's negligence claims. Therefore, Degele's Motion of Summary Judgment as to Plaintiff's negligence claim is GRANTED.

This does not mean, however, that Plaintiff cannot recover for Degele's allegedly negligent conduct. Section 2-9-305 leaves the County liable for Degele's conduct which occurred within the course and scope of his employment. Therefore, the Court must still consider Plaintiff's negligence claim based on Degele's conduct to determine the County's liability.

/ / /

/ / /

## 2. Negligence Claim Against Yellowstone County

Defendants argue Plaintiff's negligence claim fails because Degele did not breach a duty of care to Russo, and even if he did, the breach did not cause Russo's suicide. Plaintiff counters that Degele had a duty to follow YCDF policy, and that he violated this duty by allowing Russo to be placed in a general population setting. She maintains that placement of Russo in a medium security unit created the conditions by which Russo could injure himself.

Negligence requires proof of a legal duty, breach of that duty, causation and damages. *Krieg v. Massey*, 781 P.2d 277, 278-79 (Mont. 1989.) The existence of a duty is a question of law determined by the court. *Morrow v. Bank of Am., N.A.*, 324 P.3d 1167, 1177 (Mont. 2014). "Negligence actions usually involve questions of fact regarding breach of duty and causation; as a result, they are not ordinarily susceptible to summary judgment and are usually better resolved at trial." *Craig v. Schell*, 975 P.2d 820, 822 (Mont. 1999). In some circumstances, the Court can determine breach and causation, but "only where reasonable minds could reach but one conclusion." *Id.*

### a. Existence of a Legal Duty

Under Montana law, the question of duty turns primarily on foreseeability. *Fisher v. Swift Transp. Co., Inc.* 181 P.3d 601, 607 (Mont. 2008). "In analyzing whether a duty exists, we consider whether the imposition of that duty comports

with public policy, and whether the defendant could have foreseen that his conduct could have resulted in any injury to the plaintiff." *Id.* "[A]bsent foreseeability, there is no duty owed by defendants to plaintiff." *Busta v. Columbus Hosp. Corp.,* 916 P.2d 122, 134 (Mont. 1996) (quoting *Mang v. Eliasson*, 458 P.2d 777, 780 (Mont. 1969). "Conversely . . . if a reasonably prudent defendant can or should foresee a danger of direct injury, he may be negligent.  Again, the focus is on what the defendant could or could not foresee." *Newman v. Lichfield*, 272 P.3d 625, 631 (Mont. 2012).

The question of foreseeability is also central to the issue of whether a duty exists to prevent a suicide in a custodial setting.[6]  "Generally, a party cannot recover in negligence for the suicide of another 'since the act or suicide is considered a deliberate intervening act exonerating the defendant from legal responsibility.'" *Gourneau v. Hamill*, 311 P.3d 760, 763 (Mont. 2013). Nevertheless, a duty to prevent suicide may exist under certain special circumstances, such as in a custodial setting where the suicide is foreseeable. *Krieg*, 781 P.2d at 278-79; *Gourneau*, 311 P.3d at 763.  Special circumstances giving rise to such a duty may exist where the jailer "knew or should have known

---

[6] A jailer also "owes a duty to the prisoner to keep him safe and to protect him from unnecessary harm." *Pretty on Top*, 597 P.2d at 60.  Yellowstone County therefore had a duty to exercise reasonable and ordinary care for the life and health of the inmates in its custody. *Id.*

that the prisoner was suicidal." *Pretty on Top v. City of Hardin*, 597 P.2d 58, 61 (Mont. 1979). Where such special circumstances exist, "a duty arises to provide reasonable care necessary to prevent the prisoner from committing suicide." *Id.* at 61-62.

Therefore, if it was reasonably foreseeable that Russo would attempt to harm himself, Degele and Yellowstone County had a duty to exercise reasonable care to prevent Russo's suicide. The Montana Supreme Court has determined that summary judgment is appropriate where a plaintiff fails to raise an issue of material fact as to whether a suicide was foreseeable. *Marazzato v. Burlington Northern R. Co.*, 817 P.2d 672, 675 (Mont. 1991) (summary judgment affirmed where no proof was shown that employee's suicide was reasonably foreseeable); *Gourneau*, 311 P.3d at 765 (summary judgment appropriate where plaintiff failed to raise a genuine issue of material fact as to foreseeability in student's suicide); *Krieg*, 781 P.2d at 279 (summary judgment properly granted in suicide case where no genuine issue of material fact existed regarding foreseeability). On the other hand, the Montana Court has held that the jury should decide whether a boarding school student's suicide was foreseeable where questions of fact were raised. *See, Newman*, 272 P.3d at 631 ("The jury in a negligence action is tasked with deciding whether the risk in question – here, [the student's] despair and resulting suicide – was foreseeable to the defendants.").

The County and Degele assert they had no duty to prevent Russo's suicide because they did not know Russo was suicidal. Degele states that during the classification interview, Russo indicated he was not suicidal, and Russo did not act suicidal. (Doc. 71 at ¶¶ 3, 5.) Plaintiff counters that a duty of care arose from the fact that: 1) Russo's Progress Sheet stated "I/m very emotional – bears watching;" and 2) Russo's classification score required placement in the maximum security unit.

The Court finds Plaintiff has presented evidence from which a jury could find Degele should have known Russo presented a suicide risk based on the notation on his Progress Sheet that he was "very emotional – bears watching." (Doc. 76-22.) Degele acknowledged that the Progress Sheet follows the detainee wherever he goes, and that staff are expected to read it. (Doc. 90-1 at 9.) While Degele states that he was not sure if he actually read the Progress Sheet (*id.*), "[a] defendant who has information readily available to him . . . that would inform him . . . of the foreseeable risk of a particular course," cannot claim lack of foreseeability based on the failure to review that information. *Prindel v. Ravalli Co.*, 133 P.3d 165, 179 (Mont. 2006). "[O]ne who makes decisions while blinded by a veil of self-imposed ignorance may not later invoke the unforeseeability of an otherwise reasonably ascertainable risk to defeat the existence of a duty." *Id.* at 179-80.

Plaintiff has also shown the Initial Custody Assessment Scale provided that a detainee with Russo's classification score of 13 should presumptively have been housed in a maximum security unit, and that supervisor approval and medical staff review were required to override the recommended custody level. (Doc. 90-5 at 27-28.)

Accordingly, the Court finds Plaintiff has raised a genuine issue of fact as to whether Russo's suicide was foreseeable. As the Montana Supreme Court stated in *Newman*, "[w]hile a jury could certainly conclude that neither [of the defendants] could have foreseen the risk of [the student's] suicide and thus were not negligent, that determination is for the jury to make only after it hears all the relevant evidence." *Newman,* 272 P.3d at 632.

### b. Breach of Duty

Once a duty has been established, the breach of that duty is a question of fact to be resolved by a jury. *Morrow v. Bank of Am., N.A.*, 324 P.3d 1167, 1177 (Mont. 2014). Nevertheless, Defendants assert that they did not breach any duty to Russo. They contend Degele was not required to implement the suicide prevention protocol with Russo because the "I/m very emotional – bears watching" notation did not mean Russo was suicidal. (Doc. 65 at ¶ 3.) Defendants further contend that regardless of the notation, Degele directly asked Russo if he was suicidal and Russo responded that he was not. (Doc. 71 at ¶ 3.) With regard to classification,

Defendants assert Degele had discretion to override the classification score and place Russo in medium security based on his prior history and his demeanor during the interview. (*Id.* at ¶ 2.)

Plaintiff responds that by failing to follow policy, Degele breached his duty of care. Plaintiff asserts the observation "I/m very emotional – bears watching" triggered the written jail policy that Russo was to be confined in administrative segregation. (Doc. 90-4 at 112.) Plaintiff also contends Russo should have been placed in maximum security based on the Facility's written classification scale. (Doc. 90-5 at 27-28.) Plaintiff states no supervisor approved a classification override to place Russo in medium security and that past history is not an element on the Initial Custody Assessment Scale form. (*Id.*; Doc. 90-1 at 18.) Plaintiff further asserts that a medical screening was required before Russo was moved out of Classification A, but no medical interview took place. (Docs. 90-5 at 54; 62 at ¶ 17.) Plaintiff also argues the County breached its duty of care by placing Russo in medium security to accommodate overcrowding.

Construing the facts in the light most favorable to Plaintiff, the Court finds there are genuine issues of material fact regarding whether a duty was breached, and that those issues are for the jury to determine.

/ / /

/ / /

###### c.    Legal Cause of Suicide

Defendants argue in the alternative that, even if Degele's classification did breach a duty of care, they did not cause Russo's suicide.  Defendants assert that Russo would have been permitted to shower unattended regardless of whether he was in a maximum security unit or a medium security unit.  Defendants point out that the shower configuration and procedures are the same in the maximum security unit as in the medium security units.  (Doc. 64 at ¶ 3.)

Plaintiff counters that speculating Russo might have hurt himself in the shower anyway is not a defense to the safeguards and policy that should have been followed.  Plaintiff argues that by placing Russo in medium security, he was free of the observation and confinement conditions unique to Classification A, which created the circumstances that permitted his suicide to occur.

The Court notes that there is a difference in the level of observation and surveillance between maximum and medium security.  In maximum security, detainees are more restricted, checked on more often, and more officers are assigned to the unit.  (*See* Docs. 90-1 at 12 (security checks in North 3 occurred every 30 minutes; security checks in Classification A occurred every 15 minutes); 90-1 at 19 ("Inmate privileges, amount of time out of the cell" are different in maximum security from other units); 90-3 at 7 ("There's two officers in [Classification A].  It's one of the few places in the building where there were

more than one officer."); 90-4 at 84 ("[T]hose housed in disciplinary or administrative segregation, will be observed more frequently, at least once every fifteen (15) minutes.").)

Moreover, if a jury finds that Russo' suicide was reasonably foreseeable, it may also find that the Defendants' failure to implement the Facility's suicide prevention procedures – either as written or as employed in practice – was a cause of Russo's death.

Causation issues generally present questions of fact. *Werre v. David*, 913 P.2d 625, 635 (Mont. 1996). Where conflicting evidence is present, the issue of causation must be decided by a jury. *Id.* This case presents genuine issues of material fact on causation, and which must be resolved by a jury.

Accordingly, having found that there are genuine issues of material fact as to the existence of a duty, breach of duty, and causation, Yellowstone County's Motion for Summary Judgment as to Plaintiff's negligence claim is DENIED.

## C.  Plaintiff's §1983 Claim Against Degele

42 U.S.C. § 1983 provides relief against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... causes ... any citizen of the United States ... the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Plaintiff alleges Degele violated Russo's constitutional rights under the Fourteenth Amendment by

exhibiting deliberate indifference to a serious mental health need. Specifically, Plaintiff argues Degele knew Russo was at risk from mental health problems, but did not call the mental health provider for evaluation or assistance. Plaintiff also argues Degele was deliberately indifferent to Russo's safety by classifying him to a medium security unit.

Degele has also moved for summary judgment as to Plaintiff's claim against Degele under 42 U.S.C. § 1983. Degele asserts he did not violate Russo's right to adequate medical care, and that he has qualified immunity from the §1983 claim. Degele contends he had no knowledge or reason to believe Russo was suicidal. Degele further argues his classification of Russo did not violate Russo's right to adequate medical care or any other constitutional right. Finally, Defendants assert there was no legal authority that would have placed Degele on notice that his actions would violate Russo's constitutional rights. Therefore, Degele asserts he has qualified immunity from the § 1983 claim.

### 1.    Deliberate Indifference

Because Russo was a pretrial detainee, Plaintiff's deliberate indifference claim arises under the Due Process Clause of the Fourteenth Amendment. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016). The Ninth Circuit recently confirmed that inadequate medical care claims brought by pretrial detainees "must be evaluated under an objective deliberate indifference standard."

*Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).[7]

Under this standard, the elements of a pretrial detainee's Fourteenth Amendment deliberate indifference claim against an individual defendant are: "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125; *See also Castro*, 833 F.3d at 1071. "With regard to the third element, the defendant's conduct must be objectively unreasonable, which turns on the facts

_____

[7] In the past, it was assumed that the standard applicable to a pretrial detainee's conditions of confinement claims brought under the Fourteenth Amendment was the same state of mind requirement as an Eighth Amendment violation, i.e., subjective and deliberate indifference to a substantial risk of serious harm. *See Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010). That holding was called into question, however, by the United States Supreme Court in *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015). In *Kingsley*, the Supreme Court applied an objective standard to excessive force claims under the Fourteenth Amendment, eliminating the requirement that the pretrial detainee show that the officers where subjectively aware that their use of force was unreasonable. *Id.* at 2472-73. The Ninth Circuit subsequently extended the *Kingsley* rationale to a Fourteenth Amendment failure-to-protect claim in *Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). In *Gordon*, the Ninth Circuit found the same rationale should apply to Fourteenth Amendment medical care claims. *Gordon*, 888 F.3d at 1124.

and circumstances of each particular case." *Gordon*, 888 F. 3d at 1125 (internal quotations and citations omitted). Consequently, a pretrial detainee does not have to prove any subjective elements about the officer's actual awareness of the level of risk. *Id.* at 1125, n.4.

Allegations of negligent conduct, however, are not sufficient to support a constitutional cause of action. "[T]he Due Process Clause of the Fourteenth Amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty or property. In other words, where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required." *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986). *See also Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). Thus, a pretrial detainee must "prove more than negligence but less than subjective intent – something akin to reckless disregard." *Gordon*, 888 F. 3d at 1125.

## 2. Qualified Immunity

Qualified immunity shields federal and state officials from civil liability under § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1)

whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016). The Court has discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, the Court will address the second prong of the qualified immunity test first, as it is dispositive of Plaintiff's claim.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) *citing Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012). The Supreme Court has cautioned that clearly established law should not be defined at a high level of generality. *Id.* The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* It is not necessary to find a case directly on point, "in which the very action in question has been held unlawful," but "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id. citing Malley v. Briggs*, 475 U.S. 335, 341 (1986).

/ / /

The plaintiff bears the burden of proving the existence of a clearly established right at the time of the alleged misconduct. *Maraziti v. First Interstate Bank*, 953 F.2d 520, 523 (9th Cir. 1992). If the plaintiff meets this burden, the defendant then bears the burden to show that his actions were reasonable, even if they might have violated the plaintiff's rights. *Id.* "[R]egardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991).

At the time of Russo's suicide, it was clearly established that a pretrial detainee had a constitutional right against deliberate indifference to the detainee's serious risk of suicide. *Van Orden v. Downs*, 609 Fed. Appx. 474, 475 (9th Cir. 2015) citing *Conn v. City of Reno*, 591 F.3d 1081, 1102 (9th Cir. 2010). However, "[i]t is insufficient that the broad principle underlying a right is well-established." *Mitchell v. Washington*, 818 F.3d 436, 447 (9th Cir. 2016). *See also Saucier v. Katz*, 533 U.S. 194, 202 (2001). "The clearly established right must be framed in light of the specific context and particular facts of the case. *Mullenix*, 136 S.Ct. at 308. Thus, the issue is whether it would have been clear to a reasonable officer in Degele's position, that his conduct was unlawful in the situation he was confronted with. *Id.*

Plaintiff has not cited, and the Court is unaware of any case holding that there is clearly established constitutional right to suicide intervention when the detainee was not exhibiting a specific suicide risk and disclaimed being suicidal. Although there was a notation on Russo's Progress Sheet indicating he was emotional and should be watched, Degele subsequently asked Russo if he was suicidal and Russo said he was not. (Doc. 76-21.) Russo also told Degele that he did not have a history of attempting suicide. (*Id.*) Therefore, this case is distinguishable from other cases in the Ninth Circuit involving custodial suicide.

In the cases the Court has reviewed where qualified immunity was rejected, the decedent had exhibited a specific suicide risk by threatening suicide, making suicidal statements, attempting suicide, engaging in self-harming behavior, or had disclosed mental or emotional problems. *See e.g. Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010); *Conn v. City of Reno*, 591 F.3d 1081 (9th Cir. 2010); *Atayde v. Napa State Hosp.*, 2017 WL 2289351 (E.D. Cal. May 25, 2017); *Campos v. Cty. of Kern*, 2017 WL 915294 (E.D. Cal. March 7, 2017); *Weishaar v. Cty. of Napa*, 2016 WL 7242122 (N.D. Cal. Dec. 15, 2016). Here, it is undisputed that Russo did not threaten suicide in front of Degele, or make any specific suicidal statements to Degele, nor did he disclose any history of mental health problems or prior suicide attempts. (Doc. 76-21.)

/ / /

Therefore, based on the circumstances Degele was presented with, the Court finds it was not clearly established that he was required to refer Russo for a mental health assessment.

Plaintiff further argues that Degele's classification of Russo constituted deliberate indifference because jail policy and the Initial Custody Assessment Scale required a maximum security placement. Plaintiff, however, has not pointed to any precedent, and the Court is not aware of any, suggesting that a violation of jail policy amounts to a constitutional violation. Indeed, "[a] mere violation of a prison policy, standing alone, does not violate the Constitution." *Bowser v. Smith*, 314 F.Supp.3d 30, 34 (D. D.C. 2018) citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984).

Accordingly, the Court finds Degele is entitled to qualified immunity.[8] As such, summary judgment is GRANTED as to Plaintiff's § 1983 claim against Degele.

/ / /

/ / /

---

[8] Although the Court has found there are genuine issues of material fact regarding whether Degele was negligent in not referring Russo for a mental health screening and by classifying Russo to medium security, deliberate indifference requires more than an allegation that a jail official was negligent. *Davidson,* 474 U.S. at 348 ("[T]he protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials").

### D. Damages

#### 1. Punitive Damages

Plaintiff seeks to recover punitive damages solely in connection with her § 1983 claim. (Doc. 3 at ¶ 52, Request for Relief ¶¶ 1-2.) Because the Court has determined summary judgment is appropriate on her § 1983 claims against both Degele and Sandra Leonard (*see* Doc. 53), her claim for punitive damages is moot.

#### 2. Constitutionality of Mont. Code Ann. § 2-9-108

In the Complaint, Plaintiff requests the Court declare the statutory cap on damages under Montana Code Ann. § 2-9-108 unconstitutional. (Doc. 3 at ¶ 37, Request for Relief ¶ 3.) Section 2-9-108 limits the damages that can be awarded against a government entity to $750,000.00 per claim. Mont. Code Ann. § 2-9-108.

The County moves for summary judgment, arguing § 2-9-108 is valid law and should be deemed constitutional. Plaintiff counters that the issue is not ripe for consideration because a jury has not yet awarded damages in excess of the statutory cap. In reply, the County concedes the issue is not ripe.

The Court agrees the issue of the constitutionality of § 2-9-108 is not ripe for determination at this point. If necessary, the Court will address the issue at a later time. The County's Motion for Summary Judgment on this issue will be DENIED at this time.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion to Amend Complaint (Doc. 79) is **DENIED**;

2.      Defendant Brian Degele's Motion for Summary Judgment (Doc. 61)
        is **GRANTED**;

3.      Yellowstone County's Motion for Summary Judgment (Doc. 77) is
        **DENIED**.

**SO ORDERED**.

DATED this 7th day of March, 2019.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge